In the Matter of FIRST AMERICAN HEALTH CARE OF GEORGIA, INC. and its wholly owned subsidiaries (Chapter 11 Case Number 96–20188), Debtors.

IHS OF BRUNSWICK, INC. and
Integrated Health Services,
Inc., Plaintiffs,

v.

STATE OF MICHIGAN, Medical Services Administration, Department of Community Health, and United States of America, Department of Health and Human Services, Through the Health Care Financing Administration, Defendants.

Bankruptcy No. 96–20188.
Adversary No. 97–2026.

United States Bankruptcy Court,
S.D. Georgia,
Brunswick Division.

Jan. 20, 1998.

M. Tyus Butler, Savannah, GA, Jerry L. Sims, Atlanta, GA, for Plaintiffs.

Robert M. Cunningham, Brunswick, GA, Co-counsel for Michigan Dept. of Community Health.

Susan A. Harris, Asst. Atty. General, State of Michigan, Detroit, MI, for Michigan Dept. of Community Health.

Lawrence B. Lee, Asst. U.S. Atty., Southern District of Georgia, Savannah, GA, for U.S.

***ORDER ON MOTION FOR SUMMARY JUDGMENT OF THE STATE OF MICHIGAN, DEPARTMENT OF COMMUNITY HEALTH, MEDICAL SERVICES ADMINISTRATION***

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Defendant Michigan Department of Community Health ("DCH") filed this Motion for

Summary Judgment on July 7, 1997; Integrated Health Services ("IHS"), successor to First American, filed its response (following late service) on October 22, 1997. This matter constitutes a core proceeding over which this Court has jurisdiction. *See* 28 U.S.C. § 157(b)(2)(I). After considering the evidence submitted, as well as the applicable authorities, I make the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

First American filed its Chapter 11 petition for relief on February 21, 1996. Immediately prior to filing bankruptcy, Debtors' principal shareholders negotiated with IHS for a merger with IHS of Brunswick, Inc., a subsidiary of IHS. The merger was successfully renegotiated post-petition,[1] and closed on October 16, 1996, for a price of $329 million following confirmation of Debtors' second amended and restated plan on October 4, 1996. In conjunction with the merger, Debtors and IHS entered into an Omnibus Settlement Agreement with the United States, Department of Health and Human Services, on September 9, 1996, agreeing to value the claim of the United States for Medicare overpayments at $255 million. (Pls.' Mot. to Enforce Discharge Inj., Ex. B.) IHS assumed liability for Debtors' obligations under the confirmed plan of reorganization. (Def.'s Mot. Summ. J., Ex. B, p. 10.)

Prior to bankruptcy, Debtor had also participated in a state-administered Medicaid program in Michigan through a provider agreement, which was assumed post-petition and assigned to IHS under the merger agreement. (Debtor's Plan of Reorganization, ¶ 5.03). Since the merger, IHS has continued to provide services under these agreements and to apply for reimbursement for those services. (Def.'s Mot. Summ. J., Ex. D, ¶ 7.) As a matter of contractual obligation, First American was obligated to

... notify the Medical Services Administration immediately, in writing, of changes affecting his/her enrollment data. Changes must be sent to: Provider Enrollment Unit; Medical Services Administration; P.O. Box 30238; Lansing, Michigan 48909. *Such changes include; ... provider files Chapter 11, Reorganization.*

(Def.'s Mot. Summ. J., Ex. C) (emphasis original and added).

In early 1996, Michigan began investigations into overpayments to First American, concluding its audit in December 1996. DCH was told of the proposed merger with IHS in March 1996, shortly after the bankruptcy case was filed, but contends that it was never informed of or served with notice of Debtor's bankruptcy. At a meeting with Debtor in March 1996 concerning the audit, DCH informed Debtor of the overpayments and told Debtor that DCH would attempt to recover those payments. Debtor did not amend its schedules at that time to include the contingent claim of DCH. In December 1996, at the conclusion of the audit, DCH informed IHS that the State of Michigan was owed $1.8 million in overpayments.

IHS acknowledges in its Motion to Enforce the Discharge Injunction that Debtor neither listed DCH nor gave DCH notice of the bankruptcy. (Pls.' Mem. Supp. Mot. Enforce Inj. at 3). Debtor did list several other departments of the State of Michigan, including the Michigan Department of the Treasury ("MDT") on its schedules and sent notice to them. *Id.* MDT filed three proofs of claim in the consolidated case for unsecured, priority, and administrative expense tax debts.[2] An Assistant Attorney General for the State of Michigan, Joe Sutton, filed a notice of appearance for the Department of the Treasury, Revenue Division, but was not served with the original notice of the bankruptcy case. Moreover, at no time was the State of Michigan generically, or the Attorney General of Michigan scheduled by Debtor or given notice of the Debtor's Chapter 11.

Michigan, through DCH, now seeks to recover the overpayments from IHS, as succes-

---

**1.** The facts of Debtors' filing and negotiations for merger are set forth in more detail in previous Orders of this Court, *see In re First American Health Care of Georgia, Inc., et al.,* 212 B.R. 408 (Bankr.S.D.Ga.1997) (Davis, J.).

**2.** The unsecured and priority portion of the claims were from tax years 1994–1996. The administrative expense claim was for the period beginning February 21, 1996, to March 31, 1996.

sor to the liabilities of First American. (Def.'s Resp. Motion Enforce Inj. at 5). IHS commenced this adversary on March 14, 1997, to enforce both the discharge injunction and the Omnibus Settlement Agreement as having extinguished any and all prepetition liability of Debtor to the State of Michigan. Defendant Michigan moves for summary judgment on three grounds—(1) Michigan has not waived its sovereign immunity; (2) Even if Michigan waived its immunity, Debtors did not properly notify the DCH of the pending bankruptcy case or of the claims bar date; (3) Even if Michigan had notice and was bound by the plan, IHS assumed the default obligations of the provider agreement in the confirmed plan.

### CONCLUSIONS OF LAW

This Court finds it unnecessary to address Defendant's sovereign immunity claims, as Defendant is entitled to summary judgment upon its stated nonconstitutional grounds. Bankruptcy Rule 7056 incorporates Rule 56 of the Federal Rules of Civil Procedure, which provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). All evidence must be considered "in the light most favorable to the non-moving party." *Rollins v. Tech-South, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987). The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant carries its burden, the burden then shifts to the nonmoving party to introduce "significant, credible evidence sufficient to show" that there is a genuine issue of material fact.

*United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991).

### I. *Assumption of Obligations Under § 365*

Even if Michigan had notice of the Chapter 11 bankruptcy case, the state asserts that IHS assumed all liabilities of First American to Michigan when it accepted assignment of First American's provider agreement as part of the plan of reorganization. The Code provides:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

▮▮▮ Michigan's contention is correct. The obligations of IHS to the State of Michigan are controlled by the maxim that "assumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits." *In re University Med. Ctr.*, 973 F.2d 1065, 1075 (3d Cir.1992).[3] Upon assumption of an executory contract, "the estate becomes liable for performance of the entire contract, as if bankruptcy had never intervened." *In re Airlift Int'l Inc.*, 761 F.2d 1503, 1508 (11th Cir.1985) (citing *In re SteelShip Corp.*, 576 F.2d 128 (8th Cir.1978)). There is "little or no dispute that a consequence of assumption

---

3. IHS asserts that DCH, as a creditor with superior knowledge of the existence of a default in the contract to be assumed, bore the burden of coming forward prior to the assumption to reveal that default; IHS cites *In re Diamond Mfg. Co.*, 164 B.R. 189 (Bankr.S.D.Ga.1994) (Dalis, J.), as support for this proposition. That case is factually distinct from, and therefore does not bear, on the case at hand. Even if DCH had superior knowledge of default, Debtor had superior knowledge of the existence of the bankruptcy case. To discharge the default, DCH must have been given "sufficient notice to require reasonable investigation and make diligent inquiry" under *Diamond Mfg.*, and Debtor did not provide such notice. *See* discussion of notice, *infra*, p. 328.

is the affirmation of the government's power to withhold post-petition reimbursement to recover pre-petition overpayments." *In re St. John's Home Health Agency,* 173 B.R. 238, 246 (Bankr.S.D.Fl.1994) citing *In re University Med. Ctr.,* 973 F.2d at 1075.[4]

The provider agreement is subject to the provisions of Michigan law known as the Social Welfare Act.[5] Under the section entitled "Conditions of participation", a provider "shall meet all of the requirements specified in this section." M.C.L.A. § 400.111b(1). Among these requirements, a provider "shall repay, restore, or reimburse, either directly *or through adjustment of payments,* the overpayment in the manner required by the director." M.C.L.A. § 400.111b(16) (emphasis supplied). Not only is this provision for payment adjustment an express condition of participation, it is also an express power granted to the social services director. The statute provides explicitly that the director may "recover payments to a provider in excess of the reimbursement to which the provider is entitled." M.C.L.A. § 400.111a(7)(d).

■■■ IHS asserts that the reimbursement provision is a statutory obligation distinct from the contractual obligations found in the provider agreement. This contention is inaccurate. "The obligation of a contract is the law which binds the parties to perform their agreement ... [T]he laws which subsist at the time and place of the making of a contract, and where it is to be performed, *enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.*" *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 429, 54 S.Ct. 231, 236, 78 L.Ed. 413 (1934) (emphasis supplied).

The view that a statute in existence must be read into a later-formed contract is found not only in Supreme Court jurisprudence, but also in precedent of this Circuit, the State of Michigan, and the State of Georgia. *See Johnson v. Powell,* 414 F.2d 1060 (5th Cir. 1969) ("Appellants concede, *as they must,* that the applicable statutes in effect when they signed their agreements must be deemed incorporated therein by reference.");[6] *see also Kramer v. Davis,* 371 Mich. 464, 472, 124 N.W.2d 292, 296 (Mich. 1963) ("Let it be noted that the statute antedates the land contract and must be deemed to be read into it.");[7] *Bankers Insurance Co. v. Taylor,* 267 Ga. 134, 475 S.E.2d 619 (Ga. 1996) ("The statute was in existence at the time Bankers issued its policy to Taylor. Therefore, the terms of the statute are read into the contract."). IHS is thus obligated to assume the burden of the statutory scheme which governs its provider agreement: in other words, to reimburse the state of Michigan under the contract for overpayments made to the Debtor.

Accordingly, Michigan is entitled to summary judgment holding that the reimbursement obligation of Debtor was not discharged, and that IHS is subject to that obligation.

## II. *Notice to the Department of Community Health*

■■■ Aside from the issue of assumption of contractual obligations, this Court finds that Debtor and IHS failed to provide legally sufficient notice to the Department of Community Health so as to discharge any claim

4. The Third Circuit in *University Med. Ctr.* denied recoupment to the creditor on the facts of the case, but did not dispute that a right to reimbursement existed. Both the Third Circuit in *University Med. Ctr.* and the district court in *In re St. John's Home Health Agency* addressed the state's right of recoupment or of reimbursement as a burden which is assumed with the contract.

5. The provider agreement is set forth in Exhibits C and E of Michigan's Motion for Summary Judgment.

6. Decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, shall be binding as prece-

dent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

7. IHS relies almost solely upon *In re Kings Terrace,* 1995 WL 65531 (Bankr.S.D.N.Y.1995), *aff'd,* 184 B.R. 200 (S.D.N.Y.1995). That case is manifestly inapplicable. First, the state department in that case was served with actual notice of the pending bankruptcy case and failed *knowingly* to file its contingent claim. Second, the court found that no formal assumption occurred. Third, it relied only upon New York law which distinguished between statutory and contractual obligations contrary to Supreme Court and Michigan precedent.

or obligation owing that creditor. The starting point in this inquiry is Rule 2002(a), which provides that "the clerk ... *shall give* the debtor, the trustee, *all creditors,* and indenture trustees not less than 20 days notice by mail of ... (8) the time fixed for filing proofs of claims pursuant to Rule 3003(c)." FED.R.BANKR.P. 2002 (emphasis supplied). Michigan relies on § 523(a)(3)(A), which provides:

> A discharge ... does not discharge an individual debtor from any debt neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit ... timely filing of a proof of claim, unless such creditor had notice or actual knowledge *of the case* in time for such timely filing.

11 U.S.C. § 523(a)(3)(A) (emphasis supplied). This reliance is erroneous, however, because in this Circuit a corporate debtor is not an "individual debtor" for purposes of this Code section. *In re Spring Valley Farms, Inc.,* 863 F.2d 832, 834 (11th Cir.1989). The Eleventh Circuit's decision in *Spring Valley* is controlling in cases of corporate debtors, and takes the result one step farther; a debt is not discharged if a creditor "was known to an individual corporate debtor and failed to receive notice under Bankruptcy Rule 2002(a)(8), *even if* the creditor had actual knowledge of the general existence of the bankruptcy proceedings." *Id.* at 835 (emphasis supplied). The court noted, however, that its holding might be different if the creditor had actual knowledge of the bar date itself, rather than knowledge of only the proceedings in general. *Id.* at 835 n. 2.

### A. Notice to the Department of Community Health

Because the case was filed under Chapter 11, the bankruptcy court clerk's office used a procedure for noticing which required the Debtor to send notice and then to submit a certificate of service on creditors, with a list of addresses served. *Order Requiring Debtor to Serve Notice,* Ch. 11 No. 96–20188 (Bankr.S.D.Ga. Feb. 27, 1996). IHS contends that the State of Michigan had notice of the bar date because service was made on "the Michigan Employment Security Department, Michigan Department of Civil Rights, Michigan Department of Treasury, and Michigan Department of Commerce." (Pls.' Resp. Mot. Summ. J., p. 4). The question presented is whether notice of the bar date given to other departments of the State of Michigan constitutes notice to DCH.

As a minimum requirement, a creditor must receive notice "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank and Trust,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Moreover, general knowledge of a debtor's bankruptcy proceedings is not a substitute for the official notice commanded by the Code. *See City of New York v. New York, N.H. & H. R.R. Co.,* 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953) (construing Bankruptcy Act to embody "a basic principle of justice—that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights.").

The Court assumes without deciding that notice to an attorney can be imputed to an identified client if the attorney is representing the client regarding a claim against the debtor. *See Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir.1985); *Linder v. Trump's Castle Associates,* 155 B.R. 102, 105 (D.N.J. 1993). However, I have ruled in the past that service on an attorney is not in and of itself sufficient, where the creditor did not receive notice directly and where the notice sent to the creditor's attorney did not indicate that the true party in interest was the creditor. *In re Osman,* 164 B.R. 709 (Bankr. S.D.Ga.1993). My prior holding is consistent with the Third Circuit's holding in *Maldonado* that where notice to an attorney gives no indication that it is sent on behalf of a specific creditor, that notice is insufficient. *Maldonado,* 757 F.2d at 51. The Third Circuit stated:

> [A]n attorney given notice of the bankruptcy on behalf of a particular client is not called upon to review all of his or her files to ascertain whether any other client may also have a claim against the bankrupt.

Notice sent to an authorized attorney or agent must at least signify the client for whom it is intended so that the attorney can know whom to advise to assert a claim in the bankruptcy.

*Id.* Accordingly, whatever notice of the proceedings Mr. Sutton had on behalf of MDT was insufficient to constitute notice to DCH, for DCH is not Mr. Sutton's client, and the notice to MDT did not reveal DCH as a creditor.

 Because the Code and Rules have no more specific provision than Rule 2002 as to the proper method of giving legal notice to an agency of a state government, I hold that the contract provisions regarding notice should control. Parties to a contract may designate the manner of giving of notice or the manner in which service of process is to be perfected. *National Equip., Rental, Ltd., v. Szukhent,* 375 U.S. 311, 315, 84 S.Ct. 411, 414, 11 L.Ed.2d 354 (1964). The contract provides specifically that notice of filing of a Chapter 11 should be given to the DCH at a specific address, *supra* pg. 326. Because it is uncontradicted that no such notice was given to the Provider Enrollment Unit of DCH, I hold that as a matter of law notice to DCH was insufficient.[8]

B. *DCH's Knowledge of the Bar Date*

 Given Debtor's failure to give proper notice of the bar date to DCH, the only avenue for Debtor might be to show that DCH had actual *knowledge* of the bar date, the sufficiency of which was left an open question under *Spring Valley,* 863 F.2d at 835 n. 2. Plaintiffs have established that service was made on various departments of the State of Michigan, but not on the Attorney

General of Michigan on behalf of the state generally. (Pls.' Resp., p. 5 ("The Office of the Attorney General was not served with notice of the bar date directly.")). Although Mr. Joe Sutton, an assistant attorney general, filed an appearance on behalf of the Department of the Treasury, to impute knowledge of the bar date to DCH because a single assistant attorney general representing an entirely different agency of the state had knowledge of the pendency of the case requires this Court to jump through too many hoops,[9] especially in light of affidavits submitted by Defendant which deny notice and/or actual knowledge of the case at all. *See* Def.'s Mot. Summ. J., Ex. C, ¶ 5, Aff. of David Miller ("I have not received any notice of filing of bankruptcy."); Def.'s Mot. Summ. J., Ex. D, ¶ 6, Aff. of Geer Smith; Def.'s Mot. Summ. J., Ex. E, ¶ 6, Aff. of Joyce Hight; Def.'s Mot. Summ. J., Ex. I, ¶ 4, Aff. of James Hornyak ("I was not advised that First American had filed for bankruptcy relief.").

IHS further contends that Michigan had actual knowledge because the state filed a claim on behalf of the Department of Treasury. Again, because the record contains affirmative denials of knowledge of the case by DCH, the fact that another department which was properly noticed filed a claim does not raise a genuine issue of material fact. The Eleventh Circuit clearly held that actual knowledge of the *pendency* of a case—which is the most that can be inferred from the act of filing a proof of claim by a sister agency—is insufficient. *Spring Valley,* 863 F.2d at 835.

---

8. In the absence of a contractual provision, due process would be satisfied if the notice had been given in the same manner as service in an adversary proceeding. At a minimum, this would require service on the State Attorney General. FED. R.BANKR. P. 7004(b)(6); *Gaertner v. State,* 385 Mich. 49, 187 N.W.2d 429 (Mich.1971). Since there was no such service, this avenue is unavailable to the Debtor.

9. To illustrate, assume notice was sent to the Department of the Treasury. That department forwards the notice to Mr. Sutton, who (probably) works in the Revenue Division of the Attorney General's office. Mr. Sutton must then be

assumed to know, of his own volition, that the Department of Community Health might have a claim in the case by virtue of a provider agreement which has been overpaid. Sutton then must be assumed to have forwarded the notice to the division of the Attorney General's office which represents the DCH. That division must then forward the notice to the actual assistant AG representing the DCH in its investigation of the alleged overpayments. That attorney must then be assumed to have forwarded the notice to the DCH itself. Five "steps" later, the creditor has actual knowledge of the bar date under *Spring Valley.*

The State of Michigan moves for summary judgment and supports its motion with extensive affidavits and exhibits in accord with Rule 56(e), which is remarkably clear in its command:

> When a motion for summary judgment is made and supported [by affidavits, depositions, answers to interrogatories, etc.] as provided in this rule, an adverse party *may not rest upon the mere allegations or denials of his pleading,* but his response, *by affidavits or as otherwise provided in this rule,* must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

FED. R.CIV. P. 56(e). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." *Id.* at 324, 106 S.Ct. at 2553.

IHS submitted no affidavits, no depositions, no interrogatories, and no other credible evidence to enable this Court to determine that allegations of knowledge are anything but quixotic. A status conference in this adversary was held on May 15, 1997, at which the parties were granted 90 days discovery. The scheduling order was filed in this Court on May 22, 1997, and specifies that discovery must be completed by August 15, 1997.[10] The only notice of depositions filed in the case states that "Plaintiff will take depositions of Esther Reagan, Edward Kemp, and Geer Smith ... on Wednesday, August 13, 1997." Adv. Pro. No. 97–2026, *Notice of Taking Depositions* (filed Aug. 20, 1997). The Motion for Summary Judgment was filed on July 7, 1997, but was not served until several months later. By consent order, the parties agreed that Plaintiff would be given until October 23, 1997, to file its response. Thus Plaintiff effectively had five months in which to gather evidence to show this Court that a genuine issue of fact exists, and has not done so.

Michigan has made an affirmative showing of the absence of a triable issue of fact on the issue of notice to Michigan, taking all the evidence in the light most favorable to IHS. To defeat the motion, therefore, IHS is required to come forward with evidence showing that a factual issue exists; IHS has failed to meet this burden. *See U.S. v. Four Parcels of Real Property,* 941 F.2d 1428, 1439 (11th Cir.1991). Therefore, as a matter of law I find that there was no legal notice to nor actual knowledge of the bar date by DCH or the State of Michigan.

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the Motion for Summary Judgment of Defendant, Michigan Department of Community Health, is GRANTED. Debtor's discharge does not relieve Plaintiff IHS of its obligations to reimburse Michigan for Medicaid overpayments received by Debtor.

---

10. Because HHS was added later as a defendant, I ordered IHS at the hearing to serve the scheduling order on HHS once the United States filed its answer and that at that time I would consider granting more time if needed. For purposes of this summary judgment motion, the State of Michigan is unaffected by the late entry of HHS into the case, and in any event, no request has been made on this Court for an extension of time for discovery.